**NATIONAL TREASURY EMPLOYEES UNION, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent.**

**No. 87–1165.**

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc April 25, 1990.

Decided Aug. 14, 1990.

---

Gregory O'Duden, with whom Elaine Kaplan and Kerry L. Adams were on the brief, for petitioner. Michael Wolf and Cary P. Sklar also entered appearances, for petitioner.

Arthur A. Horowitz, Atty., Federal Labor Relations Authority, with whom William E. Persina and Denise Morelli, Attorneys, Federal Labor Relations Authority,

were on the brief, for respondent. Ruth E. Peters, Atty., Federal Labor Relations Authority, also entered an appearance, for respondent.

Jeffrey Clair, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., and William Kanter, Atty., Dept. of Justice, were on the brief, for amicus curiae, urging affirmance. Gregory C. Sisk also entered an appearance for amicus curiae.

Before WALD, Chief Judge, MIKVA, EDWARDS, RUTH B. GINSBURG, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG, SENTELLE, THOMAS, HENDERSON,* and RANDOLPH,* Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting Opinion filed by Circuit Judge MIKVA.

SILBERMAN, Circuit Judge:

The National Treasury Employees Union Chapter 222 petitions for review of an order issued by the Federal Labor Relations Authority ("FLRA"), claiming that the order, directing the IRS to bargain with the union, is legally inadequate. We deny the petition.

## I.

The Houston District Office of the IRS in 1983 relocated two groups of its employees to a new suburban location. One group of nearly 400 employees came from the downtown Federal Building, and another 350 employees moved from the IRS's Westpark office. Although the IRS did not provide parking for its employees at either of the two old locations, the downtown location was accessible by public transportation (commercial parking was also available), and the employees previously assigned to Westpark typically had enjoyed free street parking there.

The agency notified the union of the pending move in September of 1982, and

---

* Circuit Judge Henderson and Circuit Judge Randolph did not participate in this decision.

the parties thereafter negotiated several matters relating to the move,[1] reaching agreement by December on all issues except parking facilities for employees at the new location. Although the IRS was not altogether forthcoming with information about the parking facilities, the union eventually learned that the General Services Administration had leased 650 parking places at the new location for employee and visitor use; the union then sought to limit the number of spaces reserved for management. The union also proposed a cap on the parking charges that employees would have to pay—apparently asking the agency to, at least in part, subsidize employee parking.

The IRS resisted the union's proposals; although the agency took a number of different positions, it ultimately asserted that it had no obligation to negotiate over the union's proposals because the IRS could not legally subsidize parking under the Travel Expense Act, *see* 5 U.S.C.A. §§ 5701–5752 (West 1980 & Supp.1990), and because the union's proposal would interfere with the agency's ability to determine its own budget, *see* 5 U.S.C. § 7106(a)(1). The union filed an unfair labor practice charge, and the ALJ and the Authority on appeal held that the agency had not bargained in good faith, in violation of 5 U.S.C. §§ 7116(a)(1) and (5), and ordered the agency to do so. *See United States Dep't of the Treasury, Internal Revenue Serv. and United States Dep't of the Treasury, Internal Revenue Serv. Houston Dist. and Nat'l Treasury Employees Union and Nat'l Treasury Employees Union, Chapter 222,* 25 F.L.R.A. 843 (1987). The FLRA rejected the IRS's nonnegotiability defense because it thought the union's proposals were directed primarily at the distribution of the assignment of leased parking places between management and bargaining unit employees. The Authority, moreover, viewed the union's proposals for a cap on parking charges as flexible; the union had proposed a parking subsidy only to the extent the agency could provide it legally.

The IRS has not appealed the Authority's determination. The union has petitioned for review, however, because the Authority denied the union's requested remedy, a retroactive bargaining order ("RBO"). In other words, the union had asked that the Authority direct the IRS to bargain with the union over the parking proposals with the condition that whatever agreement that ultimately emerged be automatically applied retroactively to the date of the unfair labor practice. The Authority declined to order such a remedy in this case, relying on the criteria for issuing RBO's it set forth in *Environmental Protection Agency and American Federation of Government Employees,* 21 F.L.R.A. 786 (1986) ("*EPA and AFGE*"). In that earlier case, the FLRA announced that in determining whether to issue such an order it would weigh the effect on agency operations, whether the agency's refusal to bargain came in the face of a prior Authority decision that the issue was negotiable, and whether or not the agency refused to comply with impasse resolution procedures. The Authority further noted that if the parties bargained to an impasse on the issue, the Federal Service Impasse Panel, which is empowered in that event to fashion an agreement, could then make the parking provisions retroactive. *See id.* at 788–91.

A divided panel of this court granted the union's petition for review, *see National Treasury Employees Union v. Federal Labor Relations Auth.,* 856 F.2d 293, 296 (D.C.Cir.1988), but the full court vacated the panel decision on November 23, 1988 and granted rehearing *en banc, see* 856 F.2d at 308 (D.C.Cir.1988).

## II.

When a federal court of appeals reviews an administrative agency's choice of remedies to correct a violation of a law

---

1. The parties bargained over a new employee grievance resolution procedure, an on-site health service, a credit union office, physical configuration and safety features of the workplace, assignment of offices, procedures for evaluating the new facility, and parking arrangements.

the agency is charged with enforcing, the scope of judicial review is particularly narrow. Almost fifty years ago the Supreme Court, in reviewing a National Labor Relations Board remedial choice, explained why:

> Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy.

*Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941). Nevertheless, petitioner asserts that Congress did not intend to grant the FLRA discretion to choose a remedy to correct an agency's unfair labor practice that would fall short of making employees "whole," and it contends that the only way that the employees can be made "whole" here is by use of an RBO.

The language of the Federal Service Labor–Management Relations Act, 5 U.S.C.A. §§ 7101–7135 (West 1980 & Supp.1990), appears to us, however, to exude indications of a broad congressional delegation of discretion to the FLRA to fashion appropriate remedies for an unfair labor practice. Section 7105(g)(3) states that the Authority may "take any remedial action *it* [the FLRA] considers appropriate to carry out the policies" of the federal labor statute. 5 U.S.C. § 7105(g)(3) (emphasis added). Congress then broadly listed in section 7118(a)(7) the measures the FLRA could implement to correct violations of the statute:

> (a)(7) If the Authority ... determines ... that the agency or labor organization named in the complaint has engaged ... in an unfair labor practice, then [the Authority] ... shall issue ... an order—
> (A) to cease and desist from any such unfair labor practice in which the agency or labor organization is engaged;
> (B) requiring the parties to renegotiate a collective bargaining agreement in accordance with the order of the Authority and requiring that the agreement, as amended, be given retroactive effect;
> (C) requiring reinstatement of an employee with backpay in accordance with section 5596 of this title; *or*
> (D) including *any combination of the actions* described in subparagraphs (A) through (C) of this paragraph *or such other action as will carry out the purpose of this chapter.*

5 U.S.C. § 7118(a)(7) (emphasis added). Subparagraph (D) underscores Congress' intent, that the FLRA be granted discretion to choose what it deems the appropriate responses to an unfair labor practice.[2]

Petitioner's textual argument, as we understand it, is that the words "shall issue ... *an* order" in section 7118(a)(7) oblige the Authority, in the case of an agency's refusal to bargain, to issue *the* order described in subparagraph (B)—one "requiring the parties to renegotiate a collective bargaining agreement in accordance with the order of the Authority *and* requiring that the agreement, as amended, be given retroactive effect." (emphasis added). That argument assumes that subparagraph (B) is the only provision that may be employed to remedy an agency's refusal to bargain, which seems a dubious proposition given the character of the statute's remedi-

**2.** The legislative history of section 7118 is skimpy. The House version of the legislation closely resembled the bill that ultimately passed, and the Conference Report on the final bill contained no analysis of what is now section 7118(a)(7). The House Committee Report is thus the most authoritative legislative history we possess. *See American Jewish Congress v. Kreps*, 574 F.2d 624, 629 n. 36 (D.C.Cir.1978); *American Airlines v. Civil Aeronautics Bd.*, 365 F.2d 939, 948–49 (D.C.Cir.1966). In discussing what action the Authority should undertake in response to an unfair labor practice, the House Report contained the following passage:

> The [Authority's] order shall require the party to take such action to carry out the policies of chapter 71. The action ordered *may* include: ceasing and desisting from the unfair labor practice; directing retroactive amendment of a collective bargaining agreement; requiring an award of reasonable attorney's fees and reasonable costs and expenses of litigation; or requiring reinstatement of employees with backpay and interest.

H.R.Rep. No. 1403, 95th Cong., 2d Sess. 53 (1978) (emphasis added).

al prescriptions. Under the National Labor Relations Act, for instance, an employer's refusal to bargain is remedied under a provision similar to subsection (A), the general cease and desist authority. *See* 29 U.S.C. § 160(c). Subparagraph (B) apparently was designed not to circumscribe the FLRA's remedial discretion, but to provide specific authority, not available to the NLRB, actually to fashion and order the terms of a collective bargaining agreement.[3]

But even were petitioner's assumption correct—that Congress intended subparagraph (B) of section 7118(a)(7) to serve as the FLRA's authority to remedy refusals to bargain—petitioner's argument ignores subparagraph (D), which explicitly empowers the FLRA to include in an order "any combination of actions described in subparagraphs (A) through (C) ... or such other actions as will carry out the purpose of this chapter." This language quite clearly empowers the Authority to order the first part of (B)—the requirement to bargain—without the second part, its retroactive application (an RBO). In short, we see nothing in the language of the statute that restricts the Authority's discretion to determine, in accordance with its *EPA and AFGE* standard, whether and when to direct RBOs as a remedy for an agency's refusal to bargain.

Petitioner, we think it fair to say, relies more heavily on the argument that the policy of the Act would be frustrated if RBOs were not employed routinely to remedy refusals to bargain, an argument which, it asserts, finds at least some support in our cases. But petitioner's general appeal to the policies of the Act encounters at the outset the difficulty that Congress quite directly entrusted the Authority, and not us, with the responsibility to "take any remedial action *it* considers appropriate to carry out the policies" of the Act. 5 U.S.C. § 7105(g)(3) (emphasis added). Recognizing that principle, we have said that "we will uphold the remedial orders of the

FLRA 'unless it can be shown that the order is a *patent attempt* to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'" *Professional Air Traffic Controllers Org. v. Federal Labor Relations Auth. ("PATCO")*, 685 F.2d 547, 585 (D.C.Cir.1982) (emphasis added) (quoting *Virginia Electric & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943)). That is a heavy burden indeed.

Still, petitioner contends that if an RBO is not employed in cases such as this, agencies will have insufficient incentive to bargain in good faith. A government agency will be tempted, the argument goes, to claim that an issue is non-negotiable because it will think that it will be able to delay bargaining at little cost. It is not apparent, however, that government agencies would be indifferent to the prospect of a determination that they violated the law or that their future bargaining should be conducted under the direction of the Authority's order. In addition, petitioner's argument ignores the unique structure of the federal sector labor relations statute, which, because of "the special requirements and needs of the Government," 5 U.S.C. § 7101(b), excludes from negotiations a host of subjects that employers would be obliged to bargain about in the private sector. For instance, section 7106(a), the "management rights" provision of the statute, ensures that agencies need not bargain over the number of employees, their hiring, assignment, and discharge, the right to contract out work, and the authority "to take whatever actions may be necessary to carry out the agency mission during emergencies." 5 U.S.C. § 7106(a); *see also Department of Defense v. Federal Labor Relations Auth.*, 659 F.2d 1140, 1143 (D.C.Cir.1981) (stating that "[i]t is permissible to bargain over the 'procedures' by which those [section 7106] rights are exercised, but not over the substance of the rights themselves"), *cert. denied*, 455 U.S.

---

**3.** The Supreme Court has concluded that, under the NLRA, the NLRB cannot dictate the terms of a collective bargaining agreement. *See H.K. Porter Co. v. NLRB*, 397 U.S. 99, 106, 90 S.Ct.

821, 825, 25 L.Ed.2d 146 (1970); *see also Professional Air Traffic Controllers Org. v. Federal Labor Relations Auth.*, 685 F.2d 547, 584 n. 79 (D.C.Cir.1982).

945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982). Sections 7103(a)(14)(C) and 7117(a), moreover, indicate that the parties may not bargain over proposals that are inconsistent with either federal law or government-wide regulations. *See* 5 U.S.C. §§ 7103(a)(14)(C), 7117(a).

The Act necessarily assumes then that a number of disputes will arise as to whether a particular subject is bargainable or not, and therefore provides for an expeditious method whereby a union may test negotiability rather than charge an unfair labor practice under section 7118. When an agency alleges that it need not bargain with the union over an issue—typically a proposal the union has submitted for inclusion in the collective bargaining agreement—the union under section 7117(c) can directly and immediately raise before the FLRA the negotiability of the proposal under informal streamlined procedures. *See* 5 U.S.C. § 7117(c). This device reduces any incentive for an agency employer to refuse to bargain simply to gain delay. And as the Authority indicated in its *EPA and AFGE* decision, if any agency refuses to bargain *after* the Authority has determined a subject negotiable, the FLRA views an RBO as then appropriate.

This unique structure makes petitioner's further recourse to the National Labor Relations Act for support seem misdirected. Under the NLRA, virtually all terms and conditions of employment are subject to negotiation. *See* 29 U.S.C. § 158(d). And there is therefore no counterpart to section 7117(c) of the Federal Service Labor–Management Relations Act. As we have only recently been reminded, although Congress looked to the NLRA when it drafted the FLRA, the differences are as significant as the similarities. *See Fort Stewart Schools v. Federal Labor Relations Auth.*, — U.S. —, 110 S.Ct. 2043, 2047, 109 L.Ed.2d 659 (1990) (stating that the federal sector labor relations statute "contains no indication that it is to be read *in pari materia*" with the NLRA). But, in any event, we have never held that the NLRB is obliged to adopt a remedy similar to an RBO when fashioning a bargaining order. *See, e.g., Amalgamated Clothing Workers v. NLRB*, 736 F.2d 1559, 1570 (D.C.Cir. 1984).

■ To be sure, where an agency has taken unilateral action that disturbs the *status quo* and has illegally refused to give a union an opportunity to bargain over the decision (or its impact), a stronger case can be made for the proposition that the Authority, as does the NLRB,[4] *should* restore the *status quo ante* in a remedial order— that is, make the employees whole. *See American Fed'n of Gov't Employees v. Federal Labor Relations Auth. ("AFGE")*, 785 F.2d 333 (D.C.Cir.1986). That does not necessarily mean that the Authority *must* employ such a remedy as a matter of law, but in such a case it would surely bear the burden of explaining why it did not choose to make the employees whole. But that situation is not present here; there is no claim, nor could there be, that the IRS illegally took away from employees a benefit which they previously enjoyed. The agency did not provide parking for the employees in Houston one day and take it away unilaterally the next.

Admittedly, certain language in a recent case of ours, *see American Fed'n of Gov't Employees, SSA Council 220 v. Federal Labor Relations Auth. ("SSA Council 220")*, 840 F.2d 925 (D.C.Cir.1988), upon which petitioner relies, could be interpreted as mandating a certain degree or form of relief, which would be inconsistent with the deferential scope of review we previously stated in *PATCO* and reaffirm today. In *SSA Council 220*, we directed the FLRA to consider whether employees who could have been economically disadvantaged by an agency's introduction of an employer evaluation plan should be made "whole." *Id.* at 930. The agency had illegally re-

---

4. In unilateral action cases, the NLRB has taken the view that it will " 'order restoration of the *status quo ante* to the extent feasible, and in the absence of evidence showing that to do so would impose an undue or unfair burden upon the respondent.' " *NLRB v. Cauthorne,* 691 F.2d 1023, 1025 (D.C.Cir.1982) (quoting *Allied Prods. Corp., Richard Bros. Div.,* 218 N.L.R.B. 1246 (1975), *enforced in part,* 548 F.2d 644 (6th Cir. 1977)).

fused to bargain over the impact and implementation of the plan, and the Authority had issued a prospective bargaining order. We remanded with instructions that the Authority focus on the qualification of the employees for a "full measure of monetary relief" and we suggested an RBO as a possible means to accomplish such relief. *Id.* Insofar as *SSA Council 220* appeared to require more than a request for adequate explanation, we now reaffirm that any such direction or instruction would exceed the appropriate limits of judicial review of an agency's choice of remedies.

\* \* \* \* \* \*

We conclude the FLRA's decision to issue a prospective bargaining order was well within its discretion, and we have no grounds to dispute its remedial choice. Accordingly, the union's petition for review is

*Denied.*

MIKVA, Circuit Judge, dissenting:

The Supreme Court has emphasized that, in reviewing the decisions of the Federal Labor Relations Authority (FLRA), "the 'deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress.'" *Bureau of Alcohol, Tobacco & Firearms v. FLRA ("BATF")*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (quoting *American Ship Building Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965)). Thus, reviewing courts "must not 'rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *Id.* (quoting *NLRB v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)). Because the court has done just that in the present case, I dissent.

The National Treasury Employees Union (NTEU) had tried to negotiate with the Internal Revenue Service (IRS), seeking parking spaces for its members who were being moved to the new IRS headquarters in Houston. The IRS refused to bargain and, after a hearing, the FLRA found that this refusal constituted an unfair labor practice. Nevertheless, the FLRA denied the Union's request to give any future agreement on parking retroactive effect. In upholding that FLRA denial, this court further frustrates the basic purposes of the labor relations statute governing federal employees, the Civil Service Reform Act of 1978.

A brief review of the facts of this case and the history of the collective bargaining statute for federal employees brings into sharp relief the way this court derogates statutory purpose—and text—in favor of an undue deference to the executive branch of government. Prior to the relocation of the federal employees represented by petitioner, parking had not been a serious concern. Employees at the downtown location of the Houston IRS had adequate public transportation as well as a substantial variety of commercial parking options available to them. Employees assigned to the Westpark location had free street parking. When the IRS determined to move the employees to a new location in Houston, it negotiated for parking with its landlord and obtained a total of 650 parking spaces to be reserved for IRS use. Upon learning of the move, the Union immediately raised the question of parking as a collective bargaining issue. The court's opinion characterizes the IRS response to the Union's request as "not altogether forthcoming." Maj. Op. at 966. To parse this euphemism, the record reflects that, initially, the IRS claimed it did not have any of the information requested by the Union (such as costs and escalation clauses). The agency then claimed that it was precluded from paying for any employee parking by federal regulation. Next, the IRS claimed that only its Regional Commissioner had authority to agree to pay for employee parking, and the local managers had not been granted that authority. As to space reservations, the agency insisted that only the landlord could provide such reservations. When all of those dodges fell by the wayside, the IRS insisted that it had no obligation to bargain about parking at all.

Barred by statute from applying any economic pressure on the government employing agency, the Union filed unfair labor practice charges with the FLRA. More than four years later, the FLRA found that the IRS had in fact committed an unfair labor practice (a finding that is not in dispute), but the Authority refused to order that the past transgressions be remedied in any way. The IRS was told that it had violated the law, that it should bargain with the Union about parking, and that it should go forth and sin no more.

If Congress had so limited the relief available to the employees, or had indicated that FLRA could so limit the relief, this case would not be of great moment. The future of western civilization hardly turns on whether federal employees get reserved or subsidized parking spaces. But Congress had in fact recognized and accommodated the disparity in bargaining power between private and public sector employees vis-a-vis their respective employers. When a private employer refuses to bargain about some issue, the employees can not only file an unfair labor practice charge with the National Labor Relations Board (NLRB), but can also exercise a whole panoply of economic pressures, including strike and slowdown. Under such circumstances, the National Labor Relations Act (NLRA) left the shape of the remedy for refusal to bargain to NLRB discretion and to private bargaining. When both bargainers can influence the decision equally, Congress left the choice of remedy flexible. While the NLRB sometimes makes its private sector remedies retroactive (back-pay awards are but one example), the NLRB enjoys the discretion not to do so most of the time.

By contrast, when Congress drafted the Civil Service Reform Act in 1978 for federal employees, it described the remedies in detail—perhaps too much detail for the plain meaning to be deciphered easily. One remedy is etched out very clearly. When the FLRA finds that an employing agency has engaged in an unfair labor practice during the collective bargaining process, Section 7118(a)(7)(B) of the Act provides that it shall issue an order "requiring the

parties to renegotiate a collective bargaining agreement in accordance with the order of the Authority *and requiring that the agreement, as amended, be given retroactive effect....*" 5 U.S.C. § 7118(a)(7)(B) (1988) (emphasis added). The conjunction between ordering the contract to be renegotiated and making the effect of such renegotiation retroactive ought to be potent. There is no comparable provision in the NLRA. The existence of such an explicit remedy, specifically to be applied to a renegotiation order, ought to carry the day in this dispute. That it does not is one more nail in the coffin of the fair labor-management bargaining scheme that was heralded by the Congress when it passed the Civil Service Reform Act in 1978.

A. *Subsection (B) Requires a Retroactive Benefit Order Whenever Renegotiation is Ordered*

During oral argument, the FLRA claimed that § 7118(a)(7)(B) is inapplicable because that provision relates only to the renegotiation of collective bargaining agreements, arguing that no agreement was ever negotiated here that could be subject to renegotiation. This assertion is plainly at odds with the factual record. Contrary to the FLRA's claim, parking was explicitly raised as an issue in the context of a much larger collective bargaining agreement concerning the office relocation. Negotiations about the parking spaces were part and parcel of the collective bargaining agreement. After the parties reached agreement on all other provisions, but were still unable to obtain information about parking, the parties agreed to execute an agreement on those "other issues" and deal with the question of parking at a later date. Thus, the collective bargaining agreement depended upon the IRS's promise to keep "the entire issue of parking ... open, including the issue of payment for parking." Pursuant to this understanding, the parties negotiated over parking in three separate sessions and even reached a preliminary agreement that would remain in effect until a permanent agreement could be reached.

It seems clear, therefore, that parking had in fact been negotiated as part of the collective bargaining agreement, and that the Authority's remedy of requiring bargaining on that issue qualifies as renegotiation. Once renegotiation was ordered, the unambiguous meaning of subsection (B) mandates that such renegotiation apply retroactively. Otherwise, the inclusion of this express retroactivity provision would be altogether superfluous, granting the FLRA a power that it would in any case have enjoyed even without an express statutory provision, as is the case with the NLRB. *See American Federation of Government Employees ("AFGE") v. FLRA*, 785 F.2d 333, 337 (D.C.Cir.1986) (per curiam) ("Even when status quo ante relief is denied in case of undue hardship, the NLRB will typically grant monetary relief, such as backpay, in addition to any order to bargain."); *Amalgamated Clothing Workers v. NLRB*, 736 F.2d 1559, 1570 (D.C.Cir.1984). At the very least, the inclusion of the retroactivity language evinces congressional intent that the FLRA should exercise this power where necessary to remedy unfair labor practices.

Of course subsection (B) is not the only provision that may be employed to remedy an agency's refusal to bargain, but neither can the remedial provision set forth above be dissected: once the FLRA requires renegotiation it must give retroactive effect to any subsequent agreement. The court places great emphasis on the catch-all language of § 7118(a)(7)(D), which authorizes the FLRA to provide a remedy that includes any combination of the three different remedies provided in Section 7118 "or such actions as will carry out the purpose of this chapter." But not a word of explanation is to be found in either the court's opinion, or the FLRA decision, as to how one carries out the "purpose" of the statute by ignoring the specific remedy provided by Congress when renegotiation is ordered. The court uses analogies to the private sector statute without ever acknowledging, let alone reconciling, the different bargaining problems that federal employees face compared to their private sector counterparts. Although conceding

that the Act is not to be read *in pari materia* with the NLRA, *see* Maj. Op. at 967–68 & 969, the court fails to appreciate or give effect to the purposeful divergence in remedial schemes embodied in the two statutes.

B. *Subsection (D) Does Not Give FLRA Unreviewable Discretion*

The majority contends that § 7118(a)(7)(D) grants the FLRA unlimited discretion to alter or modify the specifically enumerated remedies to suit a particular situation. Of course, flexibility is desirable so that the FLRA can shape relief that will best effectuate the purposes of the Act in unusual situations. But such flexibility cannot authorize an abdication of the FLRA's responsibility to make employees whole. The Authority's remedial discretion is cabined by the requirement that it mandate "such other action as will carry out the purpose of this chapter." 5 U.S.C. § 7118(a)(7)(D). Cases involving subsection (D) typically involve the use of remedies in addition to (not in derogation of) those previously enumerated. *See, e.g., AFGE v. FLRA*, 777 F.2d 751, 754 n. 13 (D.C.Cir.1985) ("This 'other action' may include the posting of a notice indicating that an agency has been found to have committed an unfair labor practice and has been ordered to cease committing such practices in the future.") (citing *AFGE v. FLRA*, 716 F.2d 47, 51 (D.C.Cir.1983) (per curiam)).

Furthermore, even if the choice of appropriate remedy is entrusted to the FLRA by the terms of the Act, that choice is not thereby entirely immunized from judicial review. The majority exaggerates petitioner's burden to demonstrate that the FLRA's action improperly frustrates the policies underlying the Act. We certainly owe deference to an agency's interpretation of the statute it administers when the statute is silent or ambiguous with respect to a particular issue. *See Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). But, as explained above, the statute here is not silent about giving renegotiation orders a retroactive effect since subsection (B)

clearly directs the FLRA to do just that. Moreover, even to the extent that subsection (D) expands the Authority's remedial discretion, the FLRA must exercise that discretion in such a way as to further the purposes of the statute, a requirement amenable to judicial scrutiny in any case.

The court emphasizes the limited scope of review of the FLRA's remedial orders, citing *Professional Air Traffic Controllers Organization v. FLRA* *("PATCO"),* 685 F.2d 547 (D.C.Cir.1982). The court in *PATCO* did state that review of the Authority's remedial orders should be highly deferential, but nowhere did it suggest that the court relinquish all responsibility for ensuring that the FLRA faithfully execute congressional policy. Indeed, a reviewing court must satisfy itself that "the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 850 (D.C.Cir.1970) (footnote omitted), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971) (quoted in *PATCO,* 685 F.2d at 585; *see also BATF,* 464 U.S. at 108, 104 S.Ct. at 449 (rejecting the FLRA's interpretation of ambiguous language in 5 U.S.C. § 7131(a) as "constitut[ing] an 'unauthorized assumption by the agency of a major policy decision properly made by Congress'" (citation and internal brackets omitted)).

In the *PATCO* case, the Authority was challenged by the striking union for applying too draconian a remedy when it revoked the union's exclusive recognition status in response to its illegal strike. Even though the FLRA was clearly and enthusiastically carrying out the congressional policy of remedying unfair labor practices, in sharp contrast to the order at issue here, the court reviewed the factual basis for the Authority's decision before upholding the order. In fact, the court here concedes that in cases where a federal agency takes unilateral action disturbing the *status quo* which is later found to constitute an unfair labor practice, the FLRA "would surely bear the burden of explaining why it did not choose to make the employee whole" through a *status quo ante* order. *See* Maj.

Op. at 969. The majority's effort to then draw a sharp distinction between a *status quo ante* order and a retroactive bargaining order is not, however, persuasive.

### C. Failure to Require a Retroactive Benefit Order Undermines Congressional Policies

Under the court's interpretation, a government agency will always have an incentive not to bargain about a new condition, because even if it is eventually found to have breached its duty, the agency will have been spared the burden of making any concessions throughout the entire period of unlawful refusal. This is contrary to the Act's purpose of deterring labor abuses against federal employees. "In passing the Civil Service Reform Act, Congress unquestionably intended to strengthen the position of federal unions...." *BATF,* 464 U.S. at 107, 104 S.Ct. at 449. When he first introduced the legislation, Congressman William Clay emphasized that "[t]he existing Federal labor-management relations program is overly biased in favor of management, the scope of bargaining is so limited as to render it virtually meaningless, [and] the procedure for the resolution of impasses and disputes is unwieldly [sic] and overly drawn out." 123 Cong.Rec. E5566 (Sept. 14, 1977).

An approach to remedies that systematically fails to deter noncompliance, or dilatory compliance, with the statute's directives is fundamentally at odds with the Authority's responsibilities. For example, under the holding of this case, the IRS will effectively receive a four and one-half year windfall for its failure to bargain since the employees need not be made whole. Moreover, the employees have no other bargaining leverage with which to recoup the benefit of any concessions they should have obtained over the last four years. Given the prohibition against striking, the NTEU is wholly at the mercy of the IRS. The agency's failure to bargain produced an obvious benefit for the agency, and the failure to grant a retroactive benefit order may encourage similar conduct by other agencies. *See AFGE v. FLRA,* 785 F.2d at 338 (recognizing that the Authority's habitual use of prospective bargaining orders

provides no incentive for management to comply with statutory obligations).

This risk is especially apparent from the facts of this case. The court brushes off the incentives argument with the observation that "[i]t is not apparent ... that government agencies would be indifferent to ... a determination that they violated the law," Maj. Op. at 968, ignoring the FLRA's finding in this case that the IRS was insincere in asserting a "good faith" refusal to bargain in the first place. The agency repeatedly changed its reasons for refusing to negotiate with the union and, according to the FLRA, "continually frustrated" efforts even to obtain information about the parking issue. The whole notion of a law with remedies anticipates that the parties will not always do what they should. Relying on employing agencies to do the right thing in lieu of ordering the very specific remedies called for in the statute superimposes this court's naivete on a congressional mandate.

The court's opinion reflects an assumption, not reflected by the words of the statute, that only where the agency unilaterally removes a bargained-for benefit is make-whole relief proper. (Even in such a case, the court seems less than enthusiastic about such relief.) Congress imposed no such limitation on make-whole relief, and up to now this court has never so read the statute. Indeed, the court's opinion goes out of its way to repudiate our recent decision in *AFGE, SSA Council 220 v. FLRA*, 840 F.2d 925 (D.C.Cir.1988), a decision that the *en banc* court in this case had not even voted to reconsider.

### D. *Conclusion*

The court today rubber stamps the Authority's decision to deny the Union's request for a retroactive benefit order, thereby effectively condoning the FLRA's tendency to grant only prospective relief. Under the guise of proper judicial deference to agency expertise, the court allows the FLRA to second-guess a clear congressional directive to both deter noncompliance with the Civil Service Reform Act and assure that affected employees are made whole by making benefit orders retroactive whenever renegotiation is ordered. Such

blatant usurpation by an agency is not warranted, nor does the *PATCO* decision dictate that this court idly stand by. In describing the "unique structure of the federal labor relations statute," Maj. Op. at 968, the court catalogues some of the special problems that face the government *qua* employer, problems that certainly do exist. But not a single word is said about the special problems that federal employees face, problems that were very specifically the concern of the Congress when it passed the statute.

As I indicated at the outset, the determination as to when the Houston employees of the IRS get recognition of their parking needs is hardly destined to shape our future. But the opinion today proclaims a deference to agency discretion that totally ignores the deference owed to congressional supremacy. The court—and the executive branch—may have a primary concern about the difficulties that government encounters as an employer, but Congress expressed *its* concern that federal employees also deserve special attention in their bargaining needs. Today, this court gives that congressional concern short shrift. I do not think that *Chevron* and *PATCO* can be interpreted to overrule Article I of the Constitution.